IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LAWRENCE J. MILLS, et al.          :          CIVIL ACTION
                                   :
        v.                         :
                                   :
GOLDEN NUGGET ATLANTIC CITY,       :
LLC, et al.                        :          NO. 19-19610

MEMORANDUM

Bartle, J.                                    August 18, 2021

        Before this court is the motion of plaintiffs Lawrence
J. Mills and Daniel Chun for partial summary judgment pursuant
to Rule 56 of the Federal Rules of Civil Procedure and motions
for summary judgment on behalf of all defendants.

        Plaintiffs bring this action against defendants Golden
Nugget Atlantic City, LLC and Landry's LLC (collectively
referred to as "Golden Nugget"), along with five members of the
New Jersey State Police, Richard Wheeler, Mark Devine, Michael
Flory, Lance Moorhouse, and Carl Smallwood[1] for alleged
violations of their rights under the United States Constitution
as well as for the commission of various torts under New Jersey
law.  The claims all stem from the arrest of plaintiffs at the

---

1.   Devine, Flory, Moorhouse, and Smallwood will be
collectively referred to as "the State Police defendants."

Golden Nugget casino in Atlantic City, New Jersey on November 2, 2017.[2]

Plaintiffs allege the following state and federal claims against some or all of the defendants:  (1) conversion; (2) consumer fraud; (3) fraud; (4) unjust enrichment; (5) breach of fiduciary duty; (6) breach of contract; (7) false arrest; (8) battery; (9) false imprisonment; (10) negligence; (11) gross negligence; (12) negligent hiring; (13) false light; (14) invasion of privacy/intrusion upon seclusion; (15) defamation; (16) civil conspiracy; (17) intentional infliction of emotional distress; (18) negligent infliction of emotional distress; (19) malicious prosecution; (20) malicious abuse of process; (21) malicious use of process; (22) conspiracy to violate civil rights under 42 U.S.C. § 1983; (23) violation of Fourth Amendment rights against unreasonable seizures under 42 U.S.C. § 1983; (24) violation of Fourth Amendment rights against unreasonable searches under 42 U.S.C. § 1983; (25) violation of Fourth Amendment rights against excessive force under 42 U.S.C. § 1983; (26) violation of Fourteenth Amendment rights to substantive due process under 42 U.S.C. § 1983; (27) violation of Fourteenth Amendment rights to

---

2 .  Mills has also brought suit against New Jersey State Police Officer Michael Nelson in Mills v. Nelson, Civil Action No. 20-7037 for actions related to the same arrest on November 2, 2017.  Nelson is not a defendant in this action.

procedural due process under 42 U.S.C. § 1983; (28) violation of Fourteenth Amendment rights for damage to reputation under 42 U.S.C. § 1983; and (29) violation of the New Jersey Civil Rights Act, New Jersey Statutes Annotated sections 10:6-1 et seq.

On June 24, 2020, this court granted dismissal of certain counts as to the State Police defendants.[3]  On May 5, 2021, plaintiffs voluntarily dismissed certain counts against Golden Nugget.[4]  As a result of these dismissals, plaintiffs no longer bring any claim for gross negligence (Count XI), negligent hiring (Count XII), and negligent infliction of emotional distress (Count XVIII).  In addition, plaintiffs agreed in their opposition to the motion of Golden Nugget for

_____

3.   The following claims were dismissed on behalf of Mills: Counts I (Conversion), VII (False Arrest), VIII (Battery), IX (False Imprisonment), XIII (False Light), XIV (Invasion of Privacy/Intrusion upon Seclusion), XV (Defamation), XVI (Civil Conspiracy), and XVII (Intentional Infliction of Emotional Distress).  Counts X (Negligence), XI (Gross Negligence), and XVIII (Negligent Infliction of Emotional Distress) were dismissed on behalf of both plaintiffs.

4.   The following claims were dismissed on behalf of both plaintiffs against Golden Nugget: Count VII (False Arrest); Count IX (False Imprisonment); Count XI (Gross Negligence); Count XII (Negligent Hiring); Count XIII (False Light); Count XV (Defamation); Count XVIII (Negligent Infliction of Emotional Distress); Count XIX (Malicious Prosecution); Count XX (Malicious Abuse of Process); Count XXI (Malicious Use of Process); Count XXIV (Search); Count XXVI (Substantive Due Process); and Count XXVIII (Reputation Interest).

summary judgment to dismiss voluntarily their claims for fraud (Count III) and breach of fiduciary duty (Count V) in their entirety.[5]

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted when there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence

---

5.   While Wheeler has filed a motion for summary judgment on various counts, he did not file an opposition to plaintiffs' motion for summary judgment. On July 1, 2021, counsel for Wheeler filed a letter with the court requesting that Wheeler's motion for summary judgment be also considered in opposition to plaintiffs' motion for summary judgment. (Doc. #82). To the extent Wheeler moves for summary judgment on any claims in which plaintiffs move for summary judgment, the court will deem him to oppose plaintiffs' summary judgment on those counts.

of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  Id.  In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

II

The following facts are undisputed.  In November 2017 Chun, Mills, and some friends traveled from Maryland to Atlantic City, New Jersey for vacation.  They stopped at the Golden Nugget casino.  Chun had not met Mills before this trip.  At the time, Golden Nugget was running a promotion where it would match in bonus money the amount a person deposited up to $1,000.  On November 2 Chun opened an internet gaming ("i-gaming") account with Golden Nugget and deposited $1,000 in cash at the Golden Nugget cage in the casino.  This money was a loan from Mills.  Mills testified at his deposition that he used other people's online gaming accounts to play for them and guaranteed to them a certain amount of any winnings.  As part of opening the account, Chun had to enter personal biographical information to set up the account and agree to Golden Nugget's Terms and Conditions.

After Chun had set up his account and deposited the money, he went to the casino's Wine and Wi-Fi Lounge where he was unable to log-in to his account to start playing. He called customer service and the casino's technical support multiple times and followed their instructions for waiting before logging in again. Mills was on his computer in the lounge at the time.

At some point Chun spoke to Jeuel Cato,[6] the online gaming payments analyst for Golden Nugget Online Gaming, who asked him a series of personal questions including why he was at the casino. After unsuccessfully attempting to log-in following these calls, Chun went to the cashier to request his money back but could not withdraw the funds because his account was frozen.

Antoinette Cafone,[7] Golden Nugget's internet gaming and compliance manager, testified at her deposition that a patron can usually cash out whenever he wants but cannot cash out the matching bonus money. However, the casino personnel can temporarily block the account when the casino believes that something is amiss or wants to investigate a matter further. On

---

6. Cato reviews online gaming accounts for suspicious activity like fraud, money laundering, and bonus abuse. Bonus abuse occurs when someone creates an account to take advantage of a promotion and does not make any deposits themselves but rather just wagers with the bonus money rather than their own money.

7. Cafone manages the integrity of the internet gaming system and ensures compliance with Division of Gaming Enforcement regulations.

this day, Cafone was notified by the cage that several individuals from Maryland had deposited $1,000 in cash back-to-back for i-gaming accounts. Cafone found this situation to be unusual when multiple individuals come in a row in person to place the same amount on online gaming into newly created accounts. In her experience, most customers deposit money in person for playing on the casino floor and deposit money online for i-gaming accounts.

Cato testified that she receives automatic reports when there are deposits of $1,000 or more so that the casino can monitor the activity if needed. When she spoke to Chun over the phone about his account being down, his behavior in her view was not typical of a legitimate player. It was suspicious to her that there was "similar activity between different types of people at relatively the same time or within a close time frame of one another."

Virginia Carr, the surveillance manager for Golden Nugget, filed a so-called DICE report the morning of November 2, 2017 for "suspicious activity." The report states that "Monitor Room advised in past hour or so 6 deposits of $1,000 each made on i-Gaming accounts. Mostly from Maryland." She testified that it was her decision as to what to put into the report and whether to file it at all. After a DICE report is created, it is sent to the Division of Gaming Enforcement of the New Jersey

State Police ("Division").  Carr did not speak to any members of law enforcement after filing the report and had nothing to do with the report after she filed it.

The Division receives many DICE reports, and it is up to the State Police whether to follow up on a report with a phone call or visit to the casino to investigate it further.  In this instance, defendant Detective Sergeant Richard Wheeler went to the casino to follow up on this DICE report.  Wheeler works for the New Jersey State Police in the Casino Gaming Bureau and was in the Financial Crimes Unit at the time.  Wheeler sees a lot of DICE reports and does not pursue every one, but he decided to do so in this case.  He informed his supervisor, defendant Detective Sergeant Carl Smallwood, that he wanted to investigate this matter further because of potentially fraudulent activity.

Wheeler and Smallwood responded to the DICE report on the afternoon of November 2 around 2:30 or 3:30 pm with Wheeler taking the lead on the investigation.  At some point, Wheeler spoke by phone with Cafone about the situation.  Cafone testified that it was up to the State Police whether to come to the casino to investigate the matter.  She told Wheeler that it was suspicious that a group of individuals from Maryland had all opened new accounts and deposited the same amount in cash at the

same time.  She did not mention anything about a fraud or scheme to him.

When they arrived at the casino, Wheeler and Smallwood proceeded to the Wi-Fi lounge where they saw an individual who was later identified as Mills sitting on the couch with a computer and communicating to two other people nearby.  When asked at his deposition if he observed anyone doing anything overtly illegal, Wheeler responded "[t]hey were on the phone. The person who was eventually identified as Mr. Mills was directing activities to the other two."

Wheeler and Smallwood surveilled Mills and the others before Wheeler called defendant Lieutenant Michael Flory, head of the Intelligence Management Unit, for backup in conducting surveillance.  Flory and defendant Detective Sergeant Lance Moorhouse responded to Golden Nugget as backup as did Officer Nelson[8] and defendant Officer Mark Devine.[9]  Flory testified that upon arrival he spoke with Wheeler and Smallwood who pointed out Mills as the person of interest.  Nelson and Devine spoke to Moorhouse and Smallwood when they arrived at the casino and were told to surveil the suspect in the lounge.  Nelson and Devine

8.  Nelson has worked in the Casino Gaming Bureau since 2014 and was working for the Special Investigations Unit on November 2, 2017.

9.  Devine worked in the Strategic Investigations Unit at the time.

did so for about fifteen to twenty minutes during which they observed Mills use his phone but could not hear what he was saying.

Eventually Moorhouse and Smallwood followed to the parking garage the people who had been talking to Mills. Wheeler and Flory subsequently joined them.  Smallwood and Moorhouse stopped a person who was later identified as Chun along with his friends in the garage by their car.  Wheeler then arrived and arrested Chun.  By the time Flory arrived the subjects were talking to Wheeler, Moorhouse, and Smallwood.

Chun testified that he was "slammed from behind against the car door" by Wheeler and was put on the ground in handcuffs without explanation.  The officers then searched Chun and about twenty to thirty minutes later put him in a van and transported him and his friends to the police station.  He was later released without charge.

When Wheeler was arresting Chun, Chun told him he was there to make money from the casino.  At this point, Wheeler called Devine and directed that he and Nelson were to arrest Mills.  According to Devine, Wheeler had told him on the phone that he, Wheeler, had probable cause based on the totality of the circumstances that Mills was "involved in some kind of scam, some kind of comp [computer] scam or something of that nature."

Devine told Nelson that they were directed to arrest Mills and escort him to the police station.

Based on Wheeler's orders, Nelson and Devine then approached Mills, identified themselves as police officers, and informed him he was under arrest.  They took him outside the lounge, handcuffed him, searched him, and transported him to the station where he was placed in the holding cell area, fingerprinted, and interviewed.

Mills was charged with theft by deception and released.  His wallet and briefcase were returned to him at the time but not his laptop and cell phone.  Wheeler prepared the investigation report and typed up the summons and criminal complaint against Mills.

On November 10, 2017, some eight days after Mills and Chun were arrested, Golden Nugget concluded its investigation into Chun's account.  Cato advised Chun by email that day that his account was open and available for playing or cash-out. Chun asserts that he never received that email but agreed that his email address was correct.  He has never attempted to withdraw the funds.

On June 1, 2018, the New Jersey Attorney General's office dismissed the charge against Mills "in the interests of justice."  Thereafter Mills received back his phone and laptop.

III

We start with plaintiffs' federal claims for violation
of their rights under the Fourth and Fourteenth Amendments
pursuant to 42 U.S.C. § 1983.  Section 1983 states:

> Every person who, under color of any
> statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or
> causes to be subjected, any citizen of the
> United States or other person within the
> jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities
> secured by the Constitution and laws, shall
> be liable to the party injured in an action
> at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff
must allege:  (1) the violation of a right secured by the
Constitution or laws of the United States; and (2) the alleged
deprivation was committed or caused by a person amendable to
suit under § 1983 and acting under color of state law.  West v.
Atkins, 487 U.S. 42, 48 (1988).

Analysis of a § 1983 claim begins with identifying
"the exact contours of the underlying right said to have been
violated" and then determining "whether the plaintiff has
alleged a deprivation of a constitutional right at all."  Nicini
v. Morra, 212 F.3d 798, 806 (3d Cir. 2000)(quoting Cty. of
Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

Plaintiffs bring these claims against Golden Nugget
and against Wheeler and the State Police defendants in the

officers' individual capacities.  Golden Nugget argues that it
is not a state actor subject to suit under § 1983.  Wheeler and
the State Police defendants assert that the constitutional
claims are without merit since they had probable cause for the
arrests.  They also claim they are subject to qualified
immunity.

A. State Action

The court first turns to the question whether Golden
Nugget is a state actor for purposes of § 1983.  When
determining whether a party is a state actor, our Court of
Appeals has explained that there must be "such a 'close nexus
between the State and the challenged action' that seemingly
private behavior 'may be fairly treated as that of the State
itself.'"  Leshko v. Servis, 423 F.3d 337, 339 (3d Cir.
2005)(quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic
Ass'n, 531 U.S. 288, 295 (2001)).  The two broad categories of
this close nexus are "an activity that is significantly
encouraged by the state or in which the state acts as a joint
participant" and instances involving "an actor that is
controlled by the state, performs a function delegated by the
state, or is entwined with government policies or management."
Id. at 340.  The first category is about "whether the
fingerprints of the state are on the activity itself," and the
latter is about "asking whether the actor is so integrally

13

related to the state that it is fair to impute to the state responsibility for the action." Id.

To answer this question of close nexus set forth in Leshko, our Court of Appeals has outlined three broad tests from the Supreme Court to determine whether state action exists: (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) "whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009).

There is no evidence that Golden Nugget was a state actor. It is therefore not subject to a claim under § 1983. All that it did was conduct regular surveillance, file the DICE report for what it considered to be suspicious activity, and speak with law enforcement. A summons of the police by a business for a disturbance does not render that business a state actor absent a conspiracy to violate constitutional rights. Bailey v. Harleysville Nat'l Bank & Tr., 188 F. App'x 66, 68 (3d Cir. 2006). Concerned citizens report suspicious activity to law enforcement every day. This is not state action. Moreover, in the case of casinos, New Jersey regulations specifically

14

require that the internet and mobile gaming manager notify the
Division of Gaming Enforcement on suspicion of illegal activity
such as cheating or theft.  N.J. Admin. Code § 13:69O-1.2(i).

Accordingly, this court will grant summary judgment in
favor of Golden Nugget and against plaintiffs on Counts XXII,
XXIII, XXV, and XXVII since it is not a state actor for purposes
of § 1983.

### B. Unreasonable Search and Seizure Under the Fourth Amendment

Plaintiffs also allege in Counts XXIII and Count XXIV
that Wheeler and the State Police defendants violated their
Fourth Amendment rights based on an unreasonable search and
unreasonable seizure.  The Fourth Amendment to the United States
Constitution provides:

> The right of the people to be secure in
> their persons, houses, papers, and effects,
> against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by
> Oath or affirmation, and particularly
> describing the place to be searched, and the
> persons or things to be seized.[10]

U.S. Const. amend. IV.  Because arrests are "seizures" of
persons, they must be reasonable under the circumstances.  See
Payton v. New York, 445 U.S. 573, 585 (1980).

_____

10.  The due process clause of the Fourteenth Amendment extends
the protections of the Fourth Amendment to the states.  See Mapp
v. Ohio, 367 U.S. 643, 655 (1961).

"To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003)(quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).  A court can look to the elements of the crime charged to see if there is probable cause to arrest.  Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003).

Because probable cause "deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018).  It does require "more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).  The subjective intent of the arresting officer is irrelevant to the question of whether probable cause existed for an arrest. Devenpeck v. Alford, 543 U.S. 146, 153 (2004).

When Wheeler arrested Chun, all that he and any of the State Police defendants had learned from the casino was that it was suspicious when individuals from Maryland deposited $1,000 in cash, in person, and at the same time created i-gaming

16

accounts.  In addition, the officers had seen Chun talking on

his phone in the Wi-Fi lounge and conferring with Mills who was

sitting in the lounge on his laptop.[11]  As noted previously, when

asked whether he had seen anything overtly illegal, Wheeler

simply testified that the subjects in the lounge "were on the

phone. The person who was eventually identified as Mr. Mills was

directing activities to the other two."

      Nothing in these circumstances would lead a reasonable

officer to believe he or she had probable cause that illegal

activity was occurring or had occurred.  There was nothing

improper in Chun's deposit of $1,000 in cash to play on his

---

11.  Defendants argue that Wheeler established probable cause,
in part, based on information from Rosalie Lopez, the i-gaming
manager at the Borgata casino, that plaintiffs had also opened
accounts there and were using the same computer device as
identified by the MAC address, a unique identification for a
given device.  Lopez, however, testified that she did not speak
to Wheeler on November 2.  A Division of Gaming Enforcement
Fraud Form was created on November 6 for Lopez regarding
Lawrence Mills as requested by Wheeler and Smallwood.  That same
day, Lopez sent an email to a colleague asking for information
on certain players including Mills for "phone IP and MAC
address" on the request of Wheeler who is "very interested in
the IP addresses also as Lawrence Mills (the only person
charged) was playing from [Golden Nugget].  He believes the two
cases are connected by Mills."  Later that day, Lopez received a
response with the MAC addresses as requested.  The record shows
that Wheeler did not possess information regarding the MAC
addresses until after the arrest.  Anything the officers learned
after the fact, such as that Mills had agreed to play for the
others and share the proceeds or that the i-gaming accounts were
tied to the same MAC address, are not relevant to establish
probable cause because they were not facts known to the officers
at the time of arrest.  See e.g., United States v. Glasser, 750
F.2d 1197, 1206 (3d Cir. 1984).

i-gaming account as part of a promotion Golden Nugget was running.  There was also nothing even suspicious in Chun's talking on the phone or in Mills sitting in the lounge operating his computer and talking to Chun.  Mere suspicion of illegal activity is not enough to establish probable cause.  See e.g., United States v. Navedo, 694 F.3d 463, 467 (3d Cir. 2012).

The only other additional fact Wheeler was aware of when he called Devine and told him to arrest Mills was that Chun had told Wheeler he was there to make money from the casino. Most who come through a casino's doors hope to make money, however unlucky they may end up being.  Mills was eventually charged with theft by deception which in New Jersey means that a person "purposely obtains property of another by deception." N.J. Stat. Ann. § 2C:20-4.  "A person deceives if he purposely" creates a false impression, prevents another from acquiring information, or fails to correct a false impression.  Id.  The facts and circumstances at the time of plaintiffs' arrests were such that no reasonable officer could have understood that probable cause existed for theft by deception or any other crime under New Jersey law.

When the arrest of a person is undertaken without probable cause, as was the case here, the search of that person and seizure of his property incident to arrest also violates that person's clearly established rights under the Fourth

18

Amendment.  See United States v. Robinson, 414 U.S. 218, 235 (1973).  The arrest of both Chun and Mills without probable cause and searches incident to those arrests violated their Fourth Amendment rights against unreasonable searches and seizures as set forth in Counts XXIV and XXIII, respectively.

It goes without saying that a plaintiff "must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 291 (3d Cir. 2018).  There must be a "showing of direct responsibility" on the part of the defendant.  Id. at 290.  An "individual's cohorts who happen to be in the immediate vicinity" are not liable under § 1983 for that individual's constitutional violations.  Id.

It is undisputed that Flory did not arrive at the parking garage at the Golden Nugget until after Chun had been detained by Moorhouse, Smallwood, and Wheeler.  Flory is not liable for an unreasonable search or seizure of Chun since he was not personally involved in Chun's arrest even if he was at the scene of the arrest.  See Jutrowski, 904 F.3d at 284-85; see also Lozano v. New Jersey, 2021 WL 3612109, __ F. 4th __ (3d Cir. Aug. 16, 2021).  Accordingly, this court will grant summary judgment in favor of Flory and against Chun on Counts XXIII and XXIV.

19

We now turn to the question of whether any of the remaining State Police defendants and Wheeler are subject to qualified immunity for their constitutional violations.

C. Qualified Immunity

The doctrine of qualified immunity shields government officials from monetary damages when their conduct does not violate clearly established statutory or constitutional rights. Pearson v. Callahan, 555 U.S. 223, 231 (2009). This doctrine balances the need to hold public officials accountable and the need to protect them from liability for reasonable performance of their duties. Id. Qualified immunity will not shield a public official from liability when a plaintiff shows that: (1) "the official violated a statutory or constitutional right"; and (2) "the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Courts may address either prong of the qualified immunity analysis first. Pearson, 555 U.S. at 236. Thus, a public official may prevail if he or she did not commit a constitutional violation, or if he or she is subject to qualified immunity because the constitutional right that was violated was not clearly established.

The Supreme Court has explained, "[t]o be clearly established, a right must be sufficiently clear 'that every

20

"reasonable official would have understood that what he is doing violates that right."'"  Reichle v. Howards, 566 U.S. 658, 664 (2012)(quoting al-Kidd, 563 U.S. at 741).  Further, "existing precedent must have placed the statutory or constitutional question beyond debate."  al-Kidd, 563 U.S. at 741.  Nonetheless, a right can be clearly established without "a case directly on point."  Id.  When analyzing whether the official's conduct violated a clearly established right, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

        "The protection of qualified immunity applies regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  Pearson, 555 U.S. at 231 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)).  "[Q]ualified immunity is an objective question to be decided by the court as a matter of law."  Curley v. Klem, 499 F.3d 199, 210 (3d Cir. 2007).  Courts are to provide "ample room for mistaken judgments" pursuant to the doctrine of qualified immunity before imposing civil liability upon law enforcement officers.  Malley v. Briggs, 475 U.S. 335, 343 (1985).

        Our Court of Appeals has ruled "there is no question that the right at issue, namely, the right to be free from

21

arrest except on probable cause, was clearly established at the time of [plaintiffs'] arrest." Orsatti, 71 F.3d at 483.  Thus Wheeler and the State Police defendants were aware that arresting plaintiffs without probable cause would violate plaintiffs' constitutional rights.

This finding, however, "does not end the court's inquiry." Id.  The Supreme Court has made clear "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." Anderson v. Creighton, 483 U.S. 635, 641 (1987).  In those instances officers who acted "in ways they reasonably believe to be lawful" will not be held personally liable.  Id. Immunity therefore depends on whether an officer's actions were objectively reasonable.  Id.

1. Wheeler

The court will first address the issue of immunity for Wheeler as the investigating officer on this incident, the arresting officer of Chun, and the officer who directed Devine to arrest Mills.

Wheeler is an experienced officer who has investigated crimes in the gaming industry since 2006.  It was not reasonable for him to conclude that there was probable cause that an unlawful activity was occurring or had occurred based solely on the fact that Chun had driven from Maryland, opened an i-gaming

account, deposited $1,000 in cash, been on the phone with customer service, and hoped to make money from the casino. Moreover, it was unreasonable for Wheeler to conclude that there was probable cause to believe Mills was committing an illegal activity because he was using his computer in the Wi-Fi Lounge — indeed the entire point of a Wi-Fi lounge — and was talking to Chun and others nearby.  Therefore, in the specific context of this case, the court finds that Wheeler's actions in concluding he had probable cause to arrest plaintiffs were not reasonable. He is not entitled to qualified immunity.  The court will therefore grant summary judgment in favor of plaintiffs on liability and against Wheeler on Count XXIII.[12]

2. Moorhouse, Devine, and Smallwood

The fact that Wheeler claimed to have probable cause for these arrests does not make the arrests lawful.  Our Court of Appeals explained in Rogers v. Powell, a § 1983 action, that "statements by fellow officers conveying that there is probable cause for a person's arrest, by themselves, cannot provide the 'facts and circumstances' necessary to support a finding of probable cause."  120 F.3d 446, 453 (3d Cir. 1997)(quoting Whiteley v. Warden, 401 U.S. 560, 568 (1971)).  Rather, "the lawfulness of a seizure made in reliance on the statements of

---

12.  Plaintiffs did not move for summary judgment on Count XXIV (Unreasonable Search).

fellow officers 'turns on whether the officers who issued the statements possessed probable cause to make the arrest.'" Rogers, 120 F.3d at 453 (quoting United States v. Hensley, 469 U.S. 221, 231 (1985)).

In Rogers, a police officer received "vague and inconclusive statements" regarding the existence of an arrest warrant that did not in fact exist and relied on that supposed arrest warrant in making an arrest. Id. at 449. Another officer assisted in the arrest based on the first officer's representations to him of a valid arrest warrant. The Court of Appeals found that the arrest itself was unlawful because the first officer "had no knowledge of any facts or circumstances to support his own independent determination that probable cause to arrest [plaintiff] existed." Id. at 453.

However, even if an arrest is unlawful, the doctrine of qualified immunity may still shield an officer from liability if he reasonably relies on "what proves to be the flawed conclusions of a fellow police officer." Id. at 454-55. "[W]here a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity . . . provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." Id. at 455.

The Court of Appeals concluded in Rogers that it was
not reasonable for the first officer to believe that probable
cause existed because he never received "any statement
confirming the existence of probable cause or a warrant itself."
Id. at 456.  Nonetheless, it was objectively reasonable for the
second officer to believe there was probable cause for the
arrest since the first officer, contrary to what he had been
told, "unambiguously related [to the second officer] the
existence of an arrest warrant."  Id.  That second officer had
qualified immunity.

In this matter it was objectively reasonable for
Devine to believe probable cause existed for plaintiffs' arrests
based on what Wheeler conveyed to him.  Wheeler unambiguously
said to Devine that Wheeler had probable cause based on the
totality of the circumstances to arrest Mills for a computer
scam and directed Devine to do so.  Devine reasonably relied on
the statement of Wheeler, an experienced officer, that there was
probable cause to arrest Mills.  As such he is protected by
qualified immunity for his violations of Mills' Fourth Amendment
rights under § 1983.

However, it was not objectively reasonably for
Moorhouse to rely on the assertions of Wheeler in detaining
Chun.  Moorhouse testified that Wheeler instructed Moorhouse to
stop Chun and his friends because they were "suspects in an

25

investigation that [Wheeler] was involved in concerning online gaming." Moorhouse also testified that as a result of this stop, Chun was not free to leave. Unlike the second officer in Rogers, Wheeler did not unambiguously convey to Moorhouse that there was probable cause for Chun's arrest. Wheeler merely told him that Chun was a suspect. This does not rise to the level of probable cause. Therefore, Moorhouse is not entitled to qualified immunity for his violation of Chun's Fourth Amendment rights under § 1983.

Likewise, Smallwood testified that as Wheeler's supervisor, Wheeler would not arrest or detain someone without his consent. Wheeler was running the investigation at the Golden Nugget, but Smallwood testified that the decision to arrest or detain Chun and Mills was made by both him and Wheeler. Like Wheeler, Smallwood had surveilled Mills on his computer in the lounge. He stated that their decision to arrest plaintiffs was based on the information about the i-gaming accounts and surveillance of Mills on his computer "doing something." It was not objectively reasonable for Smallwood to make the decision to arrest plaintiffs based solely on these facts and observations. Accordingly, Smallwood is not entitled to qualified immunity for his role in the search and seizure of plaintiffs in violation of their Fourth Amendment rights under § 1983.

This court will therefore grant summary judgment as to liability in favor of plaintiffs and against Moorhouse, Smallwood, and Wheeler for Count XXIII. Summary judgment is granted in favor of Devine and Moorhouse and against plaintiffs on Counts XXIII and XXIV.

D. Conspiracy to Violate Civil Rights

Plaintiffs allege in Count XXII that Wheeler and the State Police defendants conspired to violate plaintiffs' civil rights by arresting them and thereby unreasonably seizing and searching them.

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." Jutrowski, 904 F.3d at 293-94 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150-52 (1970)). "After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right . . . plaintiff 'must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.'" Id. at 295 (internal citations omitted). An agreement exists when the state actors "reached an understanding to deny the plaintiff his rights" which can be a "meeting of the minds" or inferred from circumstantial evidence. Id. In instances of alleged conspiracy among police officers,

this agreement may be demonstrated by "conversations between officers about the incident, allegedly distorted stories that emerged, an awareness of conflicting stories and irregularities in the series of official investigations into the incident." Id.

Plaintiffs have failed to point to any facts in the record that would enable a reasonable jury to conclude that any defendants conspired to violate their civil rights. Plaintiffs have not shown any type of understanding or agreement between Wheeler and the State Police defendants to violate their rights. There is nothing in the record to establish that any of the officers conferred ahead of time and agreed to arrest plaintiffs without probable cause. Nor are there any conflicting stories or irregularities that would enable a reasonable jury to infer that the officers conspired to do so. The undisputed facts demonstrate that Wheeler arrested Chun without any prior agreement to do so and then told Devine to arrest Mills because he claimed to have probable cause for Mills' arrest. This court will therefore grant summary judgment on Count XXII in favor of Wheeler and the State Police defendants and against plaintiffs.

E. Excessive Force Under the Fourth Amendment

Plaintiffs also claim in Count XXV that they were subject to excessive force upon arrest in violation of their Fourth Amendment rights. A claim that a police officer used

28

excessive force during a seizure is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989).  In doing so, the court must analyze the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.  Just because a person has been falsely arrested does not mean that excessive force has been used.  See e.g., Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "Officers who detain a suspect unlawfully should be liable for the harm proximately caused by their tortious detention, but this will not necessarily include all harm resulting from the otherwise reasonable use of force to carry out the detention." Id. at 400 n.10.

Neither plaintiff cites to any facts that demonstrate defendants used excessive force during the arrest.  Chun testified that the front of his body was "slammed" against the car door and that he had "[j]ust a little pain" in the middle of his chest for a few hours afterwards but no bruising.  He also testified about pain in his wrist and shoulder for two to three days after but that he did not see a doctor or have pain after that.  Mills does not allege any pain from his arrest.  Both were handcuffed for a few hours while they were interviewed at

the station.  There is nothing to establish that the officers acted in an objectively unreasonable manner during the arrest as plaintiffs were not injured and the force used caused minimal pain.  Therefore we will grant summary judgment in favor of Wheeler and the State Police defendants and against plaintiffs on Count XXV.

F. Due Process Claims Under the Fourteenth Amendment

Plaintiffs assert in Counts XXVI through XXVIII that Wheeler and the State Police defendants violated their Fourteenth Amendment rights to substantive due process, to procedural due process, and to their reputations.  The Fourteenth Amendment provides in part that:  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

Plaintiffs claim that Wheeler and the State Police defendants violated their right to substantive due process by falsely arresting, searching, and holding them.  However, under the "more-specific provision rule," any constitutional claim "covered by a specific constitutional provision" must be analyzed under the standard appropriate to that specific provision and not under the more general rubric of substantive due process under the Fourteenth Amendment.  Cty. of Sacramento

v. Lewis, 523 U.S. 833, 843-44 (1998).  Plaintiffs' claim relating to their arrest and subsequent search and detention at the police station must be addressed under the Fourth Amendment for unreasonable searches and seizures, as previously discussed. Therefore this court will grant summary judgment in favor of Wheeler and the State Police defendants and against plaintiffs on Count XXVI.

In Count XXVII, plaintiffs claim that Wheeler and the State Police defendants violated their procedural due process rights by taking plaintiffs' property interest in the $1,000 Chun deposited and by keeping Mills' laptop and phone even after he was released.  To state a claim for deprivation of procedural due process under § 1983, a plaintiff must allege that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'"  Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006).

There are no facts to support the claim that a state actor deprived Chun of his $1,000 deposit.  Golden Nugget made the decision to freeze Chun's account, not the New Jersey State Police, and Golden Nugget, as discussed above, is not a state actor.  As for the seizure of Mills' laptop and phone, there is nothing in the record to demonstrate that Mills lacked available

procedures for the return of his property.[13]   The court finds
nothing to evidence a denial of plaintiffs' procedural due
process rights under the Fourteenth Amendment.   The court will
grant summary judgment in favor of Wheeler and the State Police
defendants and against plaintiffs on Count XXVII.

    Plaintiffs also bring a claim under the Fourteenth
Amendment for deprivation of a liberty interest in reputation by
being arrested in front of casino patrons and for Mills' charge
of theft by deception.  While a person has a protectable
interest in reputation, "reputation alone is not an interest
protected by the Due Process Clause."  Id. at 236.  A plaintiff
must instead "show a stigma to his reputation plus deprivation
of some additional right or interest."  Id.  "To satisfy the
'stigma' prong of the test, it must be alleged that the
purportedly stigmatizing statements (1) were made publicly . . .
and (2) were false."  Id.  As for the "plus" prong, the Supreme
Court stated that in successful cases for deprivation of liberty
or property interest "a right or status previously recognized by
state law was distinctly altered or extinguished."  Paul v.
Davis, 424 U.S. 693, 711 (1976).

---

13.  For instance, motions for the return of seized property may
be made to the Superior or Municipal Court pursuant to New
Jersey Court Rule 3:5-7.  Mills does not argue, nor is there any
evidence to suggest, that he sought return of his property and
was denied due process in seeking that return.

Neither plaintiff has identified any evidence that his reputation was damaged in any way or that he lost a previously recognized legal right or status because of his arrest or, in the case of Mills, because of a criminal charge.  This court will therefore grant summary judgment in favor of Wheeler and the State Police defendants and against plaintiffs on Count XXVIII.

IV

The court now turns to plaintiffs' state law claims. Count I of the complaint is for conversion, which Mills asserts against Golden Nugget and Chun brings against all defendants. This claim is based on allegations that Golden Nugget unlawfully converted Chun's balance of $1,000 for its own use.  Mills avers that he had a possessory interest in the $1,000 since he loaned it to Chun, and they had agreed to a share of the profits.

Plaintiffs do not make reference to any evidence that the State Police defendants or Wheeler had anything to do with this alleged conversion.  Golden Nugget argues that plaintiffs have failed to show that Golden Nugget wrongfully acted in freezing Chun's account pursuant to its terms and conditions.

"[C]onversion is the intentional exercise of dominion and control over chattel that seriously interferes with the right of another to control that chattel." Meisels v. Fox Rothschild LLP, 222 A.3d 649, 661 (N.J. 2020).  This dominion or

control must be "without authorization and to the exclusion of the owner's rights in that property" to constitute conversion. Chi. Title Ins. Co. v. Ellis, 978 A.2d 281, 288 (N.J. Super. Ct. App. Div. 2009).  In addition, a plaintiff must prove that he demanded the return of his property, that he was refused, and that this refusal was wrongful.  Meisels, 222 A.3d at 660.

The record is clear that Chun demanded the return of the $1,000 he deposited with Golden Nugget and that Golden Nugget denied its return on November 2 while his account was frozen.  However, there is no evidence that this refusal was wrongful.  When a customer such as Chun creates an i-gaming account, he must accept the terms and conditions to that account.  Section 4.5 of the terms and conditions state that "a Player may experience other delays due to any security review undertaken by us, or when any other provision of this Agreement allows or requires us to hold a payment."  Furthermore section 4.9 states that "[i]n the case of suspected or fraudulent payment . . . we reserve the right to block a User's account," and section 7.1 states that "[i]f we suspect you may be engaging in or have engaged in fraudulent, unlawful or improper activity . . . or conduct otherwise in violation of this Agreement, your access to the System may be terminated immediately and/or your Account blocked."

Multiple Golden Nugget personnel testified as to why they deemed Chun's actions to be suspicious in depositing $1,000 in cash for i-gaming at the same time as others who deposited the same amount for newly created accounts.  It is undisputed that Golden Nugget froze Chun's account on November 2, 2017 while it undertook an investigation into these circumstances and subsequently unfroze his account eight days later on November 10 when that investigation was completed.  Golden Nugget was acting with authorization in accordance with its terms and conditions to which Chun had agreed.  There is nothing in the record that shows that Golden Nugget broke any law or acted wrongfully when it froze Chun's account temporarily or that the State Police defendants and Wheeler interfered with this money at all.[14]

---

14.  The parties reference the New Jersey i-gaming regulations which authorize a gaming system to place an account in a suspended mode "[w]hen initiated by a licensee that has evidence that indicates:  i. Illegal activity; . . . or iv. A violation of the terms or service has taken place on an authorized patron's Internet or mobile gaming account."  N.J. Admin. Code § 13:69O-1.4(j)(4).  Plaintiffs argue that Golden Nugget did not have any evidence of illegal activity or a violation of the terms of service when it suspended Chun's account.  However, as previously stated, Golden Nugget acted in conformance with its terms and conditions which both plaintiffs consented to when it temporarily blocked access to Chun's account because it suspected improper activity.  This state regulation does not prohibit Golden Nugget from requiring its patrons to agree to its terms and conditions set forth above in return for the opportunity to use the online gaming platform.

Accordingly, this court will grant summary judgment in favor of all defendants and against plaintiffs as to Count I.

V

Plaintiffs assert a claim for consumer fraud against Golden Nugget in Count II.  They argue that as a result of Golden Nugget's alleged conversion of $1,000 plaintiffs suffered a loss of $1,000.[15]  Golden Nugget counters that consumer fraud is meant for unlawful sales and advertising, to which this claim does not relate, and that no reasonable jury could conclude that it acted unlawfully.  Golden Nugget also maintains that plaintiffs have not suffered an ascertainable loss.

Consumer fraud under the New Jersey Consumer Fraud Act ("NJCFA") exists when there is:  "(1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and ascertainable loss."  Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 305 (3d Cir. 2016). The NJCFA defines an unlawful practice as:  "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon

---

15.  Plaintiffs allege in their complaint that they also suffered a loss of $9,250 for their legal defense as a result of Golden Nugget's "original fraud."  They do not make this argument in their motion for partial summary judgment.

36

such concealment . . . in connection with the sale or advertisement of any merchandise or real estate." N.J. Stat. Ann. § 56:8-2. Merchandise includes "objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J. Stat. Ann. § 56:8-1.

There is no evidence in the record that Golden Nugget violated the NJCFA. Although plaintiffs argue that the promotion Golden Nugget was running constitutes fraud under this act, the promotion was not for "the sale or advertisement of any merchandise or real estate." See N.J. Stat. Ann. § 56:8-2. A promotion to match a customer's deposit in bonus money does not constitute "merchandise" under the NJCFA. See N.J. Stat. Ann. § 56:8-1. Furthermore, there is no evidence that Golden Nugget's promotion of match play up to $1,000 was used to deceive plaintiffs or misrepresent any aspects of the promotion. Rather, Golden Nugget permitted Chun to continue using the promotion to wager with matching funds once it completed its investigation.

In addition, plaintiffs have not shown any loss stemming from the freeze on Chun's account. Golden Nugget notified Chun that his $1,000 was available to cash-out or use to wager on November 10, 2017. Now almost four years later neither Chun nor Mills has claimed the money from Golden Nugget. This omission negates any notion of ascertainable loss. As

such, this court finds as a matter of law that Golden Nugget did not violate the NJCFA.  Summary judgment will be granted accordingly in favor of Golden Nugget and against plaintiffs as to Count II.

VI

Chun has sued Golden Nugget for breach of contract in Count VI based on the terms and conditions to which he consented when he created an i-gaming account with Golden Nugget.  Chun initially alleged that Golden Nugget breached these terms and conditions by blocking him from accessing his account and preventing him from withdrawing his money.  Chun has now shifted his position.  He maintains in his opposition to Golden Nugget's motion for summary judgment that these terms and conditions are illegal because they allow Golden Nugget to take customer funds without any illegal activity by the customers and that the proper claim for recovery is unjust enrichment.  Chun does not cite to any legal authority to support his argument that the terms and conditions are illegal.

Golden Nugget responds that Chun has failed to show it breached its contract since it acted in accordance with its terms and conditions.  It also argues that there is no evidence of any damages in the record.

To recover on a breach of contract claim, a plaintiff must show:  "(1) a contract between the parties; (2) a breach of

that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007).

The terms and conditions that Chun signed before opening an i-gaming account clearly state that this agreement forms a "legally binding contract between you and Golden Nugget Atlantic City, LLC." Again, section 4.5 of the terms and conditions specifically provides that "a Player may experience other delays due to security review undertaken by us, or when any other provision of this Agreement allows or requires us to hold a payment." Section 4.9 also states that Golden Nugget may block an account "[i]n the case of suspected or fraudulent payment."

Chun has not called to this court's attention any evidence of a breach of that contract by Golden Nugget except to say that freezing his account violated section 4.5 which provides that "payments generally will be made as soon as reasonably possible (subject to up to three to five business days internal processing time)." Chun is incorrect. Golden Nugget did not violate this agreement by freezing Chun's account while it conducted an investigation for suspicious activity.

There is nothing illegal about these contractual provisions. The record is undisputed that Golden Nugget

complied with these terms and conditions by temporarily blocking
Chun's account for only a few days while it conducted an
investigation into suspicious activity before enabling him to
access his account.  Accordingly, summary judgment will be
granted in favor of Golden Nugget and against Chun with respect
to Count VI.

VII

Plaintiffs bring a claim of unjust enrichment against
Golden Nugget in Count IV.  They argue that Golden Nugget
benefitted by receiving Chun's $1,000 deposit and kept this
money for itself without compensation even when Chun demanded
its return and was told by customer service that he would be
able to play in twenty minutes.  In support of its motion for
summary judgment, Golden Nugget maintains that the doctrine of
unjust enrichment is not applicable because there is an existing
contract between the parties.

Under New Jersey law, to establish unjust enrichment
"a plaintiff must show both that defendant received a benefit
and that retention of that benefit without payment would be
unjust." VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 554 (N.J.
1994).  This doctrine "requires that plaintiff show that it
expected remuneration from the defendant at the time it
performed or conferred a benefit on defendant and that the
failure of remuneration enriched defendant beyond its

40

contractual rights."  Id.  Unjust enrichment liability will not

be imposed "if an express contract exists concerning the

identical subject matter."  Suburban Transfer Serv., Inc. v.

Beech Holdings, Inc., 716 F.2d 220, 226-27 (3d Cir. 1983).

There is an express contract in this action.  Chun and

Mills both agreed to Golden Nugget's terms and conditions when

they opened i-gaming accounts.  Those terms and conditions state

up front in all capital letters that this agreement creates "a

legally binding contract between you and Golden Nugget Atlantic

City, LLC."  As a valid contract exists in the record, this

court will grant Golden Nugget's motion for summary judgment

against plaintiffs as to Count IV for unjust enrichment.

VIII

Chun asserts a claim of battery in Count VIII against

Wheeler and the State Police defendants.[16]  Chun argues in his

motion for partial summary judgment that the battery took place

when Wheeler handcuffed him without the legal authority to do

so.  While he names the State Police defendants in this count of

the complaint, he does not include any specific battery

allegations against any of the State Police defendants and only

---

16.  Plaintiffs do not list Wheeler among the other officers in
the heading for this count in the complaint, but they do include
factual allegations about Wheeler in support of this claim in
the complaint.  Thus we will construe this count as against
Wheeler for battery in addition to the other State Police
defendants.

references Wheeler in his briefs.  Wheeler does not address this claim in his motion for summary judgment.

Battery is a tort based on "nonconsensual touching." Leang, 969 A.2d at 1117.  "Under a battery theory, proof of an unauthorized invasion of the plaintiff's person, even if harmless, entitles him to nominal damages" as well as the possibility of punitive damages.  Perna v. Pirozzi, 457 A.2d 431, 438 (N.J. 1983).

There is no evidence that any of the State Police defendants touched Chun without his consent.  Therefore this court will grant the motion of the State Police defendants for summary judgment against Chun as relates to Count VIII.

The court finds as a matter of law that Wheeler committed a battery against Chun when he arrested and handcuffed Chun without consent and without probable cause.  This does not end our analysis, for the court must determine whether Wheeler is entitled to good faith immunity under the New Jersey Tort Claims Act ("NJTCA").

The NJTCA shields public employees under certain circumstances from liability for acts done in good faith.  See N.J. Stat. Ann. § 59:3-3.  The NJTCA states that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a

public employee from liability for false arrest or false
imprisonment."  N.J. Stat. Ann. § 59:3-3.

The Supreme Court of New Jersey has held that a public
employee "must 'establish that his or her acts were objectively
reasonable or that he or she performed them with subjective good
faith.'  Therefore, an employee may be immune from liability
under either an objective or subjective analysis."  Leang, 969
A.2d at 1112 (quoting Canico v Hurtado, 676 A.2d 1083, 1085
(N.J. 1996)).  "A public employee need prove only one
component."  Alston v. City of Camden, 773 A.2d 693, 703 (N.J.
2001).  "The same standard of objective reasonableness that
applies in Section 1983 actions also governs questions of good
faith under the [NJTCA]."  Wildoner v. Borough of Ramsey, 744
A.2d 1146, 1153 (N.J. 2000).  "The subjective component refers
to 'permissible intentions.'"  Alston, 773 A.2d at 703.  Under
the NJTCA, immunity is the "general rule, with liability the
exception."  Rosario v. City of Union City Police Dep't, 131 F.
App'x 785, 789 (3d Cir. 2005).

The evidence, as noted, is undisputed that Wheeler
committed a battery as alleged in Count VIII as a result of his
arrest of Chun.  He cannot rely on objective reasonableness.  It
is for the jury, however, to decide whether he acted with
subjective good faith so as to be immune from liability on this
count.  The court will deny the motion of plaintiff for summary

43

judgment and the motion of Wheeler for summary judgment on Count VIII.

IX

Chun has alleged false arrest in Count VII and false imprisonment under state law in Count IX against Wheeler and the State Police defendants.  Chun avers that Wheeler, Flory, Moorhouse, and Smallwood arrested and handcuffed him without probable cause or any evidence that he had committed a crime. Wheeler and the State Police defendants argue in opposition that they had probable cause for Chun's arrest.

False arrest and false imprisonment "are different names for the same tort."  Price v. Phillips, 218 A.2d 167, 169 (N.J. Super. Ct. App. Div. 1966).  False arrest is "the constraint of the person without legal justification" and requires "an arrest or detention of the person against his or her will" and "lack of proper legal authority."  Leang v. Jersey City Bd. of Educ., 969 A.2d 1097, 1117 (N.J. 2009).  "The existence of probable cause is a defense to false arrest if it serves to validate the arrest."  Mesgleski v. Oraboni, 748 A.2d 1130, 1138-39 (N.J. Super. Ct. App. Div. 2000).  The court determines whether probable cause exists and uses "the objective standard of a reasonable and prudent person in like circumstances."  Id. at 1139.  An officer's subjective good faith "is irrelevant as to liability for any false arrest or

44

false imprisonment claims." DelaCruz v. Borough of Hillsdale, 870 A.2d 259, 261 (N.J. 2005).

It is undisputed that Devine was not present for or involved in Chun's arrest. Therefore the court will grant summary judgment in his favor and against Chun on these counts.

As for Flory, he arrived at the parking garage after Wheeler, Moorhouse, and Smallwood had detained Chun and his friends. Our Court of Appeals has explained that "[m]erely being present at the scene" and even "driving the arrestee to the station, however, are not part of the arrest." Lozano, 2021 WL 3612109, at *5. As with § 1983 which is rooted in tort law, a plaintiff must show "direct and personal involvement" of a defendant to hold that defendant liable. See Jutrowski, 904 F.3d at 289; see also Lozano, 2021 WL 3612109. It is undisputed that Flory was not directly involved in Chun's arrest and was merely present at the scene. This court will therefore grant summary judgment in favor of Flory and against Chun on these counts.

The court finds as a matter of law that probable cause did not exist to arrest Chun. All that any of the defendants knew when Chun was arrested was that casino personnel had noted what in their view was the suspicious activity of multiple individuals making cash deposits of $1,000 for i-gaming accounts in person and in a row, that Chun had been talking on his phone

in the Wi-Fi lounge, that Mills was conferring with Chun while operating his laptop in the Wi-Fi lounge, and that Chun hoped to make money.[17]  None of these activities, either separately or together, rises to the level of probable cause.  As previously stated, mere suspicion does not establish probable cause.

Although Wheeler was the one who placed Chun in handcuffs, Moorhouse and Smallwood detained Chun until Wheeler arrived.  Moorhouse testified that he and Smallwood stopped Chun and his friends in the parking garage on Wheeler's instruction. Wheeler had merely advised Moorhouse that Chun and his friends were suspects in an investigation into online gaming and Wheeler needed Moorhouse and Smallwood to hold the suspects there until he arrived.  Moorhouse conceded that Chun and his friends were not free to leave at this time.  Wheeler then arrived and placed the suspects in handcuffs.  Absent probable cause, Wheeler, Smallwood, and Moorhouse did not have the proper legal authority to effectuate this arrest and thus are liable for false arrest in Count VII.

---

17.  As previously discussed, Wheeler testified that he had also spoken with Lopez at the Borgata.  However, the undisputed evidence in the record shows that Wheeler did not speak with Lopez until after the arrest.  Therefore this court will not consider any information that Lopez provided to Wheeler after the arrests when determining sufficiency of probable cause.

Defendants raise the defense of good faith immunity for this tort under section 59:3-3 of the NJTCA.  This statute does not apply here.  Section 59:3-3 specifically states that: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  Thus, good faith immunity as provided for in section 59:3-3 "does not apply to false arrest or false imprisonment claims."  DelaCruz, 870 A.2d at 268.  Accordingly, the court will grant summary judgment on liability in favor of Chun and against Wheeler, Smallwood, and Moorhouse on Count VII.

X

Count X states a claim by both plaintiffs for negligence against Golden Nugget.  They assert that Golden Nugget owed them a duty of reasonable care as to the funds Chun deposited in his i-gaming account and a duty to comply with New Jersey i-gaming regulations which Golden Nugget breached when it froze Chun's account without evidence of illegal activity.  Plaintiffs also allege that Golden Nugget negligently acted by allowing the arrest and detention of plaintiffs.  Golden Nugget counters that it did not violate any duty by reporting what it considered to be suspicious activity to the Division in accordance with New Jersey i-gaming regulations and that it did not request or advise that plaintiffs be arrested.

47

A plaintiff has the burden of establishing the following elements by some competent proof in a negligence action:  "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages."  Townsend v. Pierre, 110 A.3d 52, 61 (N.J. 2015).  The question of duty "turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy."  Hopkins v. Fox & Lazo Realtors, 625 A.2d 1110, 1116 (N.J. 1993).

Plaintiffs do not cite to any law or evidence that supports a duty not to call law enforcement.  Plaintiffs' reliance on a provision of New Jersey's i-gaming regulations is misplaced.  It simply requires mobile gaming systems to suspend an account "[w]hen initiated by a licensee that has evidence that indicates: i. Illegal activity; . . . or iv. A violation of the terms of service has taken place on an authorized patron's Internet or mobile gaming account."  N.J. Admin. Code § 13:69O-1.4(j)(4).

New Jersey i-gaming regulations mandate an online gaming platform such as Golden Nugget to act in a certain way when it has evidence of illegal activity or a customer's breach of the casino's terms of service.  Nowhere do these regulations state that these are the only circumstances in which a gaming platform can suspend or freeze an account or that a gaming

48

platform cannot enter into an agreement with customers that permits freezing based on suspicion.  The record is undisputed that Golden Nugget did not violate any duty to plaintiffs by temporarily freezing Chun's account while it investigated what it deemed to be suspicious activity.

Golden Nugget is correct that there is no evidence of damages from its alleged breach of duty.  As previously stated, Golden Nugget informed Chun that his account was available to play or cash-out in full only eight days after this incident. Neither Chun nor Mills for that matter has sought the return of the money.  This court will grant summary judgment in favor of Golden Nugget and against plaintiffs as to Count X for negligence.

XI

Chun has sued Wheeler and the State Police defendants in Count XIII for false light.  He avers that defendants presented him as a criminal by arresting him even though he had not committed illegal activity.  The State Police defendants argue that there was no publicity related to his arrest.

False light under New Jersey law involves "publicity that unreasonably places the other in a false light before the public."  Romaine v. Kallinger, 537 A.2d 284, 289 (N.J. 1988). This tort has two elements:  (1) "the false light in which the other was placed would be highly offensive to a reasonable

49

person"; and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  Id. at 290.  Publicity requires communicating the matter "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." McNemar v. Disney Store, Inc., 91 F.3d 610, 622 (3d Cir. 1996)(quoting Restatement (Second) of Torts § 652D, Comment (a)); see also Restatement (Second) of Torts § 652E.  A court will determine whether the publicity at issue would be highly offensive to a reasonable person.  Romaine, 537 A.2d at 290.

There is nothing in the record that Chun's arrest was publicized in any way so as to make the fact of his arrest common knowledge.  The presence of several of Chun's friends at his arrest in a parking garage is not sufficient since communication to a few people is not enough to be considered publicity to the public at large.  See id.  Accordingly, this court will grant summary judgment in favor of Wheeler and the State Police defendants and against Chun on Count XIII for false light.

XII

Plaintiffs both bring a claim against Golden Nugget for invasion of privacy or intrusion upon seclusion in Count XIV.  In addition, Chun brings this claim against Wheeler and

50

the State Police defendants.  Mills alleges that Golden Nugget
invaded his privacy when it captured him on his phone and laptop
on surveillance footage while in the lounge.  Chun alleges that
Golden Nugget invaded his privacy by asking him personal
questions on the phone when he was attempting to access his
account.  He does not allege that Wheeler and the State Police
defendants invaded his privacy in any way.  Golden Nugget
responds that surveillance footage in a public place is not an
intrusion upon seclusion.  It also argues that Jeuel Cato, its
online gaming payments analyst who spoke with Chun on November 2
while his account was down, asked questions for security
purposes pursuant to the terms and conditions to which Chun had
agreed and that these questions cannot be deemed highly
offensive.

          "In New Jersey, invasion of privacy is an umbrella
category that includes a number of distinct torts," including
intrusion upon seclusion.  In re Nickelodeon Consumer Privacy
Litig., 827 F.3d 262, 290-91 (3d Cir. 2016).  This tort is "a
type of invasion of privacy involving encroachment on a person's
reasonable expectations of solitude."  Id. at 291.  The elements
of intrusion upon seclusion are:  "(i) an intentional intrusion
(ii) upon the seclusion of another that is (iii) highly
offensive to a reasonable person."  Id. at 293.

New Jersey has adopted the Second Restatement of Torts which provides that there is liability for intrusion "when [the defendant] has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." Id. at 294. This tort "is tied to the placement of a surveillance device in an area reasonably expected to be private. It is the intrusion itself, and not an actual viewing, that is critical." Friedman v. Martinez, 231 A.3d 719, 731-32 (N.J. 2020)(internal citations omitted). A plaintiff would need to show "that she used an area reasonably expected to be private, like a restroom or locker room, while a recording device was concealed there." Id. at 732. "A high threshold must be cleared to assert a cause of action based on that tort." Stengart v. Loving Care Agency, Inc., 990 A.2d 650, 660 (N.J. 2010).

Plaintiffs reference nothing in the record to show that Golden Nugget intruded upon the privacy of either. It is well-known that casinos have extensive surveillance. Mills was in a public lounge in the casino when he used his laptop and phone and was openly using his phone or laptop in a manner that any passerby could have seen. The video surveillance footage cited in plaintiffs' opposing brief is from a camera on the casino floor and lounge. It was placed in an area, unlike a

restroom, where there was no reasonable expectation of privacy. See Friedman, 231 A.3d at 731-32.

As for Chun, he was not asked anything that would be highly offensive to a reasonable person.  Cato sought to verify his identity for accessing his account in accordance with the terms and conditions to which he had agreed.  She asked him questions about details related to his visit as part of the casino's investigation into suspicious activity.

Neither plaintiff has evidence that would permit a reasonable jury to find that the high threshold for establishing liability for intrusion upon seclusion has been met.  Summary judgment will be granted in favor of Golden Nugget and against plaintiffs on Count XIV.

There is nothing before the court to demonstrate that Wheeler or any of the State Police defendants invaded Chun's privacy by observing his movements or listening to his conversations in a public lounge in which he had no reasonable expectations of solitude.  Accordingly, the court will grant the motions of Wheeler and the State Police defendants for summary judgment in their favor and against Chun as to Count XIV.

XIII

In Count XV of the complaint, Chun alleges that the State Police defendants and Wheeler defamed him by holding him

out as a criminal when they publicly arrested him.  The State
Police defendants assert that Chun was not arrested in public.

        The elements of defamation are:  "(1) the assertion of
a false and defamatory statement concerning another; (2) the
unprivileged publication of that statement to a third party; and
(3) fault amounting at least to negligence by the publisher."
Leang, 969 A.2d at 1113.  The court looks to the content,
verifiability, and context of the challenged statement to
determine defamation.  Id.  "A statement falsely attributing
criminality to an individual is defamatory as a matter of law."
G.D. v. Kenny, 15 A.3d 300, 310 (N.J. 2011).

        The record contains no statement that could be
considered defamatory.  Chun merely argues that the act of his
arrest constitutes defamation.  He is incorrect.  Defamation
requires that a statement be made that is "reasonably
susceptible of a defamatory meaning."  Romaine, 537 A.2d at 288.
As there is no statement in the record to serve as the basis for
a defamation action, summary judgment will be granted in favor
of the State Police defendants and Wheeler and against Chun on
Count XV.

                              XIV

        In Count XVI, Chun alleges a claim for civil
conspiracy against all defendants and Mills alleges civil
conspiracy against Golden Nugget only.  Both plaintiffs assert

                              54

that the officers arrested them for the casino's purposes and that casino personnel directed their arrest.  The State Police defendants respond that none of them was ever in contact with Golden Nugget personnel.  Wheeler argues that Golden Nugget did not participate in any way in the arrest of Chun.  Golden Nugget likewise maintains that there is no evidence of any agreement between Golden Nugget and the officers and that plaintiffs have failed to come forward with any evidence showing it participated in any underlying wrong.

A civil conspiracy in New Jersey is "a combination of two or more persons acting in concert to commit an unlawful act . . . the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage."  Banco Popular N. Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005).  This claim focuses on the "underlying wrong which, absent conspiracy, would give a right of action."  Id.

Mills only asserts a claim for civil conspiracy against Golden Nugget.[18]  An entity cannot conspire with itself.  See Gandi, 876 A.2d at 263; see also Heffernan v. Hunter, 189 F.3d 405, 412 n.5 (3d Cir. 1999).  Therefore summary judgment

---

18.  This count to the extent it contained allegations on behalf of Mills was dismissed as to Wheeler and the State Police defendants on June 24, 2020.

will be granted in favor of Golden Nugget and against Mills on this count.

In addition, Chun has failed to present any evidence of an agreement between all or some of the State Police defendants, Wheeler, and Golden Nugget to commit an unlawful act. Cafone testified that she did not give any directions to Wheeler on what to do once he arrived or speak to any other officers on scene. Wheeler made the decision to investigate the DICE report further and received no input from Carr, who filed the DICE report. No one at Golden Nugget asked that he arrest anyone. There is also no evidence of an agreement between the officers themselves to commit a wrong. Therefore this court will grant summary judgment in favor of all defendants and against Chun on Count XVI for civil conspiracy.

XV

Chun claims in Count XVII that Wheeler is liable for intentional infliction of emotional distress. A plaintiff must establish "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe" for a finding of intentional infliction of emotional distress. Leang, 969 A.2d at 1115. The emotional stress must be "so severe that no reasonable person could be expected to endure it." Id.

Chun has not called the court's attention to any evidence that Wheeler's conduct was so outrageous that it caused

severe emotional distress.  Chun testified that he did not feel like himself, he could not focus on work, he had emotional problems for two months after the incident, and he had trouble sleeping.  He never sought medical treatment.  The Supreme Court of New Jersey has found that effects such as those experienced by Chun "do not rise to the level of severe distress required in an emotional distress claim."  DeAngelis v. Hill, 847 A.2d 1261, 1272 (N.J. 2004).  The court will grant summary judgment in favor of Wheeler and against Chun as to Count XVII.

XVI

Mills sues Wheeler in Counts XIX, XX, and XXI for malicious prosecution, malicious abuse of process, and malicious use of process.  They are "a group of closely related torts that, although ancient in origins, are treated with great caution because of their capacity to chill resort to our courts by persons who believe that they have a criminal complaint or civil claim against another."  LoBiondo v. Schwartz, 970 A.2d 1007, 1022 (N.J. 2009).

A.  Malicious Prosecution

Mills avers that Wheeler instituted criminal proceedings against him without probable cause and with malice.  The tort of malicious prosecution is meant to remedy harm from "the institution or continuation of a criminal action that is baseless."  Id.  It requires plaintiff to prove:  (1) "a

57

criminal action was instituted by this defendant against this plaintiff"; (2) "the action was motivated by malice"; (3) "there was an absence of probable cause to prosecute"; and (4) "the action was terminated favorably to the plaintiff."  Id.

Malice means "the intentional doing of a wrongful act without just cause or excuse" and is done "in utter disregard of what the actor knew to be his duty, to the injury of another." Id. at 1024-25.  It has also been characterized in the context of malicious prosecution as "either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." Morales v. Busbee, 972 F. Supp. 254, 261 (D.N.J. 1997) (Simandle, J.)(quoting Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988)).

Although a court may infer malice from a lack of probable cause or a lack of a reasonable belief in probable cause, "it is not necessarily true that legal malice will be established merely by a lack of probable cause."  LoBiondo, 970 A.2d at 1025.  The Supreme Court of New Jersey explained that "if the only evidence of a lack of probable cause was the inference derived from favorable termination of prior suit, some extrinsic evidence of malice will be required."  Id.

New Jersey has described probable cause as "a well-grounded suspicion that a crime has been or is being committed"

and exists where the facts and circumstances within the arresting officer's knowledge at the time of arrest are sufficient to believe an offense has been committed.  Brunson v. Affinity Fed. Credit Union, 972 A.2d 1112, 1121-22 (N.J. 2009). This is an objective standard similar to the understanding of probable cause in a criminal context.  Stolinski v. Pennypacker, 772 F. Supp. 2d 626, 643 (D.N.J. 2011).  "The essence of the cause of action is lack of probable cause."  Lind v. Schmid, 337 A.2d 365, 368 (N.J. 1975).

It is undisputed that Wheeler instituted a criminal action against Mills after arresting him, and the action was terminated in favor of Mills when it was dropped in June 2018. As previously discussed, when Wheeler told Devine to arrest Mills, Wheeler did not have probable cause that a crime was being committed or had been committed.  Nonetheless, there is no evidence of any malice on the part of Wheeler in directing Devine to arrest Mills or in filing a criminal charge against Mills.  Wheeler said nothing and did nothing beyond the arrest which shows any requisite ill-will.  See Morales, 972 F. Supp. at 261.  As such, this court will grant the motion of Wheeler and deny the motion of Mills for summary judgment as to Count XIX.

B.  Malicious Use of Process

Mills avers in Count XXI that Wheeler committed a malicious use of process when he instituted criminal proceedings against Mills.  Malicious use of process is the corollary to malicious prosecution and exists "when the offending action in question is civil rather than criminal." LoBiondo, 970 A.2d at 1022.  A plaintiff must prove a civil action was instituted against him, that it was motivated by malice and lacked probable cause, that this action was terminated favorably to plaintiff, and that "the plaintiff has suffered a special grievance caused by the institution of the underlying civil claim." Id. at 1023.

Because there was no civil action instituted against Mills, this court finds as a matter of law that Wheeler did not commit a malicious use of process.  As a consequence, we need not reach Wheeler's argument that he has good faith immunity under the NJTCA.  See N.J. Stat. Ann. § 59:3-3.  Accordingly, this court will grant summary judgment in favor of Wheeler and against Mills with respect to Count XXI.

C.  Malicious Abuse of Process

Mills also brings a claim for malicious abuse of process against Wheeler in Count XX based on the decision to charge him criminally.  Wheeler again argues that he has good faith immunity.

Malicious abuse of process is a tort distinct from malicious prosecution and malicious use of process.  This action is for "one who uses a writ after its issuance solely to coerce or injure the defendant."  Tedards v. Auty, 557 A.2d 1030, 1034 (N.J. Super. Ct. App. Div. 1989).  Unlike the torts of malicious use of process and malicious prosecution which involve the "employment of process for its ostensible purpose, although without reasonable or probable cause," malicious abuse of process is the "employment of a process in a manner not contemplated by law."  Id.

Essential to a claim for abuse of process is an ulterior motive and "some further act after issuance of process representing the perversion of the legitimate use of the process."  Simone v. Golden Nugget Hotel & Casino, 844 F.2d 1031, 1036-37 (3d Cir. 1988).  Plaintiff must show "some coercive or illegitimate use of the judicial process" as evidenced by an "extortionate act" to support a claim for abuse of process.  Id. at 1037, 1039.  These "further acts" include steps such as "attachment, execution, garnishment, sequestration proceedings, arrest of the person and criminal prosecution." Baglini v. Lauletta, 768 A.2d 825, 832 (N.J. Super. Ct. App. Div. 2001).

Malicious abuse of process usually involves "a form of coercion to obtain a collateral advantage, such as the surrender

of property, by the use of the process as a threat or club."
Gambocz v. Apel, 245 A.2d 507, 509 (N.J. Super. Ct. App. Div.
1968).  Some typical kinds of malicious abuse of the criminal
process include extorting money or property from a person under
arrest or compelling a person under arrest to sign something or
give up a claim that is advantageous to the prosecution.  Earl
v. Winne, 112 A.2d 791, 796 (Bergen County Ct. 1955).

A New Jersey court has found malicious abuse of
process when a landlord filed a criminal complaint against a
tenant to coerce the dismissal of a civil action the tenant had
brought against the landlord for violation of a local rent
ordinance.  Wozniak v. Pennella, 862 A.2d 539 (N.J. Super. Ct.
App. Div. 2004).  A New Jersey court has also reversed summary
judgment in favor of defendant when the defendant was an
attorney who represented the plaintiff's former wife and
obtained a writ to have plaintiff arrested and incarcerated
overnight until plaintiff paid the amount the defendant's client
sought to settle their marital dispute.  Tedards, 557 A.2d at
550.

These examples of malicious abuse of process have no
similarities to what occurred here.  There is no evidence before
the court of either an ulterior motive on Wheeler's part or any
further acts after issuance of the original criminal charge.
Mills can point to nothing to establish that Wheeler coerced or

extorted him in any way after the criminal complaint was filed
to obtain any advantage to Wheeler or against Mills.  Once the
criminal complaint was filed, Wheeler had no further interaction
with Mills.

This court will therefore grant summary judgment in
favor of Wheeler and against Mills on Count XX for malicious
abuse of process.

XVII

Finally, plaintiffs bring Count XXIX pursuant to the
New Jersey Civil Rights Act ("NJCRA") against all defendants.
See N.J. Stat. Ann. §§ 10:6-1 et seq.  "Similar to the § 1983
statute, the NJCRA allows a party who has been deprived of any
rights under either the Federal or State Constitutions by a
person acting under color of law to bring a civil action for
damages and injunctive relief."  Coles v. Carlini, 162 F. Supp.
3d 380, 404 (D.N.J. 2015).  It is interpreted analogously to
§ 1983 so that if a claim fails under § 1983 it will also fail
under the NJCRA absent a new theory of liability under that Act.
Id. at 404-05.  In addition, qualified immunity applies to
actions under the NJCRA as well as under § 1983.  Morillo v.
Torres, 117 A.3d 1206, 1214 (N.J. 2015).

Article I of the New Jersey State Constitution confers
the same rights to be free "against unreasonable searches and
seizures" as is provided for in the Fourth Amendment of the

United States Constitution.  N.J. Const. art. I, § 7.  Thus, Wheeler, Smallwood, Moorhouse, and Devine violated plaintiffs' rights under Article I of the state constitution pursuant to the NJCRA when they arrested and searched plaintiffs without probable cause.

As discussed previously in connection with plaintiffs' claims under § 1983, Flory is not liable under the NJCRA because he was not personally involved in either plaintiff's arrest.  In addition, Devine is not liable either under the NJCRA pursuant to the doctrine of qualified immunity since it was reasonable for him to rely on Wheeler's assertions that he had probable cause to arrest plaintiffs.  However, as with plaintiffs' claims under § 1983, Moorhouse, Smallwood, and Wheeler are not entitled to qualified immunity because it was not objectively reasonable for them, on the facts known to them at the time, to arrest plaintiffs without probable cause.

Accordingly summary judgment is granted in favor of plaintiffs as to liability and against Wheeler, Smallwood, and Moorhouse on Count XXIX.  As previously determined, Golden Nugget is not a state actor.  The motions of Golden Nugget, Devine, and Flory for summary judgment will be granted on Count XXIX.